**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATHANIEL STERLING, *Petitioner*, | ) ) ) | CASE NO. 3:25-CV-2122 (KAD) |
| v. | ) ) | |
| PAMELA J. BONDI, *et al.*, *Respondents*. | ) ) | JUNE 17, 2026 |

**MEMORANDUM OF DECISION**
**RE: [25] SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

Kari A. Dooley, United States District Judge:

Petitioner Nathaniel Sterling brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging his detention by Immigration and Customs Enforcement ("ICE") authorities. Petitioner was arrested by ICE agents on December 19, 2025, and has been detained ever since. Petitioner's operative Second Amended Petition for a Writ of Habeas Corpus (hereinafter, the "SAP") seeks habeas relief on four grounds: (1) Petitioner was denied due process when his initial bond (granted in 2018) was canceled without any individualized assessment, and when he was re-detained by ICE agents on December 19, 2025 without prior notice or the opportunity to be heard; (2) Petitioner's arrest at or near the Connecticut Superior Court in Manchester, Connecticut violated the Immigration and Nationality Act ("INA"); (3) Petitioner's arrest at the Manchester Superior Court violated the Tenth Amendment; and (4) Petitioner was deprived of due process in connection with his ensuing January 8, 2026 bond hearing in immigration court, insofar as the Immigration Judge (hereinafter, "IJ") denied bond based on

"inaccurate and incomplete evidence and uncorroborated police reports that [Petitioner] posed a danger to the community."[1]

At the outset, the Court recognizes that district courts across the country have, with sound reason and remarkable frequency, awarded habeas relief to petitioners challenging the constitutionality of their ICE detention and/or immigration proceedings, to include the bond hearings they received or failed to receive while held in ICE custody. Nevertheless, this case presents materially different factual context and legal arguments, and upon close review counsels a different result.[2] Though the Court is sympathetic to Petitioner's circumstances, it is bound by its limited jurisdiction and the circumscribed nature of judicial review in this context. Thus, and for the reasons that follow, the SAP is **DENIED**.

---

[1] Pursuant to *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), Petitioner also seeks immediate release from ICE custody pending the Court's adjudication of the SAP. However, such a provisional remedy is now moot, insofar as the Court has herein resolved the SAP on the merits.

On May 26, 2026, Petitioner submitted a Notice of Supplemental Authority, alerting the Court to a decision issued in the Central District of California on May 20, 2026, granting preliminary injunctive relief to plaintiffs in a class action suit challenging ICE's so-called "2025 Guidance" as a violation of the Administrative Procedure Act ("APA"). *See* ECF No. 44 (citing *Immigr. Ctr. for Women, et al., v. Noem, et al. ("ICWC")*, No. 2:25-CV-9848 (AB), 2026 WL 1455004 (C.D. Cal. May 20, 2026)). There, the district court issued a nationwide stay of ICE's 2025 Guidance as to the named plaintiffs, as well as the members of three certified classes, and reinstated ICE's prior "2021 Directive." *See id.* One such class, the "Pending Petition Class," includes Petitioner. Petitioner argues, *inter alia*, that *ICWC* "confirms the existence of 'extraordinary circumstances' warranting release pursuant to *Mapp*." *See* ECF No. 46 at 4. However, the Court reiterates that it has herein resolved the SAP on the merits, and thus concludes that *ICWC* does not alter the mootness of Petitioner's *Mapp* claim. Petitioner's additional arguments regarding the impact of *ICWC* on the SAP are addressed below.

[2] For example, some cases held that ICE detention was motivated by retaliation for engaging in protected speech, in violation of the First Amendment. *See e.g.*, *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 231 (D. Vt. 2025). *Thousands* of others involved the applicability of 8 U.S.C. § 1225(b), not at issue here, and the question of whether petitioners were entitled to a bond hearing at all. *See, e.g.*, *Sidqui v. Almodovar*, No. 25-CV-9349 (VSB), 2026 WL 251929, at *8 (S.D.N.Y. Jan. 30, 2026) (collecting cases); *see also 10,000 rulings: The courts' overwhelming rebuke of Trump's ICE policies*, POLITICO, https://www.politico.com/news/2026/05/13/10k-rulings-ice-mandatory-detention-trump-analysis-00914195 (last visited June 17, 2026). Still others involved warrantless arrests which the court later invalidated. *See, e.g.*, *Parada Cruz v. Mullin*, No. 26-CV-1110 (SJB), 2026 WL 1027441, at *3 (E.D.N.Y. Apr. 16, 2026) ("[u]sing an after-the-fact warrant to justify a prior arrest is constitutionally problematic. It also is statutorily prohibited under the INA.").

**Facts**

The Court assumes the parties' familiarity with the factual circumstances underlying the SAP, and recites herein only those relevant to its decision.

<u>Background</u>

Petitioner is a native Jamaican citizen.  SAP at ¶ 22.  On September 13, 2015, when Petitioner was sixteen years old, he lawfully entered the United States on a tourist visa, joining his mother and stepfather in Hartford, Connecticut.  *See id*.  In 2018, Plaintiff was adjudicated a youthful offender in connection with multiple criminal charges for sexual assault.  *Id.* at ¶ 23; *see also* Respondents' Show Cause Response ("OSC Response"), ECF No. 15 at 2.  On May 11, 2018, ICE commenced removal proceedings against Petitioner, on the basis that he had overstayed his tourist visa.  SAP at ¶ 24.  On June 6, 2018, IJ Michael Straus determined that Petitioner was neither dangerous nor a flight risk, and ordered him released upon posting a $12,500.00 bond.  *See id.*  Petitioner posted bond, and was released from ICE custody.  *Id.* at ¶ 25.  In connection with his release, Plaintiff was assisted by the Immigrant Bail Fund, "a now-defunct community-based organization" that served as his obligor.  *See id.*  In January 2019, United States Citizenship and Immigration Services ("USCIS") approved a Petition for Alien Relative (Form I-130) submitted by Petitioner's stepfather, which in turn, led Petitioner to seek permanent resident status.  *See id.* at ¶ 28.  On December 11, 2020, the Hartford Immigration Court denied Petitioner's application for an adjustment of status, and Petitioner timely filed an appeal to the Board of Immigration Appeals on January 7, 2021, which appeal remains pending.[3]  *Id.* at ¶¶ 28–29; OSC Response at

---

[3]  Along with the OSC Response, Respondents submitted the Declaration of Keith M. Chan, an Assistant Field Office Director for ICE.  The Chan Declaration was based on Mr. Chan's review of Petitioner's criminal, immigration, and procedural history, and provides, *inter alia*, additional context for the IJ's 2020 denial of Petitioner's application for an adjustment of status, including Petitioner's testimony regarding his four prior arrests in 2016 and 2017.  *See* Chan Decl., ECF No. 15-1 at ¶ 9.

3

2–3. In 2024, Petitioner was the victim of an unprovoked shooting and suffered near fatal injuries. SAP at ¶ 30. Based on his cooperation with the Hartford Police Department following the shooting, Petitioner was certified as eligible for a "U visa," for which he submitted an application to USCIS on September 23, 2025. *See id.*

On May 4, 2022, Petitioner was arrested on charges of disorderly conduct in connection with a domestic violence incident. OSC Response at 3. On August 11, 2022, by written correspondence, ICE demanded that Petitioner's obligor produce Petitioner for an in-person interview at ICE's Hartford office on September 20, 2022. *Id.* at 4; *see also* SAP at ¶ 36. On September 21, 2022, after Petitioner was not produced, ICE again, by written correspondence, demanded that Petitioner's obligor produce Petitioner for an in-person check in. *See* SAC at ¶ 33 (citing Exhibit C, Form I-323, ECF No. 25-1 at 9). On October 5, 2022, because Petitioner again failed to appear at his in-person check-in, ICE determined that Petitioner's bond had been breached and issued a Form I-323 Notice. *See id.* Petitioner's obligor, Ana Maria Rivera-Forastieri, did not receive the Form I-323 Notice regarding Petitioner's bond breach; and Petitioner likewise received neither the September 21, 2022 demand nor the Form I-323 Notice, or any other notice or communication regarding his required interviews/check-ins with ICE. *Id.* at ¶¶ 34–35. Petitioner regularly receives mail at his home without difficulty, and yet, at no time between his release on bond in 2018 and his arrest on December 19, 2025 did Petitioner learn of any change in conditions or status of his bond. *Id.* at ¶¶ 31, 39. Similarly, neither Petitioner's habeas counsel, nor his previous immigration counsel received notice of Petitioner's required interviews/check-ins.[4] *Id.* at ¶ 40.

---

[4] According to Respondents, it was Petitioner's arrest on May 4, 2022 that triggered an Immigration Alien Response alert to ICE, and prompted the initial August 11, 2022 demand notice. *See* OSC Response at 4 (citing Chan Decl. at ¶ 12). Respondents further assert that ICE also sent notices of both the August 11, 2022 demand and September 21, 2022 demand to Petitioner's obligor via certified mail. *See id.* (citing Chan Decl. at ¶ 13).

<u>Petitioner's Arrest</u>

Petitioner was scheduled to appear at the Manchester Superior Court on December 19, 2025, in connection with pending misdemeanor motor vehicle charges, having been informed by prosecutors that the charges would be dropped upon Petitioner's presentation of a valid driver's license.  SAP at ¶ 46.  On the morning of December 19, 2025, "at around 9:00 or 9:30 a.m.," and prior to his scheduled court appearance, approximately eight ICE agents apprehended Petitioner "at the Connecticut Superior Court in Manchester, Connecticut."  *Id.* at ¶ 45.  Approximately two hours after Petitioner's arrest, ICE prepared and served a Form I-286 Notice of Custody Determination, indicating that Petitioner has been detained without bond.  *See id.* at ¶ 51 (citing Exhibit D, Form I-286, ECF No. 25-1 at 11).  The Form I-286 Notice was signed by Anika Beaumont, Acting Supervisory Detention and Deportation Officer ("SDDO").  *See id.* at ¶ 52.

On December 19, 2025, a *nolle prosequi* was entered as to all charges pending against Petitioner in the Manchester Superior Court.  *Id.* at ¶ 54.  To date, Petitioner remains in ICE custody at Wyatt Detention Center ("Wyatt") in Central Falls, Rhode Island.  *See id.* at ¶ 56.

<u>The Bond Hearing</u>

On December 24, 2025, Petitioner filed a motion with the immigration court seeking a "custody redetermination hearing," *i.e.*, a bond hearing.  *See id.* at ¶ 57.   On January 8, 2026, Petitioner appeared for such a hearing in Chelmsford Immigration Court.  *Id.* at ¶ 62.  There, through counsel, Petitioner "presented substantial evidence in support of his request for release on bond, including evidence that he had no criminal convictions or pending charges."  *Id.*  DHS, in opposing Petitioner's release, initially asserted that Petitioner had entered the United States "without inspection," and thus, was ineligible for bond.  *Id.* at ¶ 63.  DHS later withdrew that argument, but further argued that bond should be denied because Petitioner had been convicted of

a firearms offense and had additional pending criminal charges; and otherwise posed a danger to the community. *See id.* at ¶¶ 64–65, 68. DHS's statements concerning Petitioner's criminal history were false, and its assertions of dangerousness were only supported by "uncorroborated police reports." *Id.* at ¶¶ 67–68. Counsel for Petitioner corrected the record regarding Petitioner's criminal history; however, DHS did not withdraw the false assertion regarding Petitioner's criminal history. *See id.* at ¶¶ 66–67. At the conclusion of the hearing, the IJ denied bond "based on the totality of the record, as well as [DHS]'s evidence," having determined that DHS met its burden of demonstrating by clear and convincing evidence that Petitioner was a danger to the community. *See id.* at ¶ 70.

On February 18, 2026, the IJ issued a written memorandum which, *inter alia*, set forth the record evidence before the immigration court and detailed the reasons for her bond decision. Pet. Supp. Reply, Exhibit C, ECF No. 32-1 at 13–16. The IJ acknowledged that Petitioner had not been convicted of any violent crimes, and that any crimes for which he had been arrested were disposed of through accelerated rehabilitation programs, but nevertheless underscored the significance of Petitioner's immigration and criminal history. *See id.* at 15. In particular, the IJ observed that Petitioner "has developed a lengthy criminal history" since entering the United States in 2015, to include a youthful offender adjudication related to sexual assault allegations where Petitioner completed three years of probation; a December 4, 2021 interaction with law enforcement in which Petitioner was the passenger in a car with firearms; and two traffic-related incidents in 2025 in which Petitioner nearly caused motor vehicle accidents and was non-compliant with officers. *See id.* at 16.

**Procedural History**

Through counsel, Petitioner filed his initial Petition on December 19, 2025, shortly after his arrest. *See* Petition, ECF No. 1. In connection therewith, Petitioner also filed an emergency motion seeking an order enjoining Respondents from transferring Petitioner more than 100 miles from the District of Connecticut, pending the Court's adjudication of the Petition. ECF No. 2. That same day, "[p]ursuant to the Court's authority under the All Writs Act, 28 U.S.C. § 1651, to preserve the Court's jurisdiction and the integrity of these proceedings, the Court [] restrain[ed] ICE from transferring Petitioner to any ICE detention facility beyond 150 miles of the Connecticut border during the pendency of the instant habeas corpus petition." *See* ECF No. 6. The Court further set an expedited briefing schedule on the Petition. *See id.*

On December 24, 2025, Petitioner filed an Amended Petition. ECF No. 12. On January 9, 2026, Respondents filed the OSC Response, regarding the Amended Petition. OSC Response, ECF No. 15. On January 15, 2026, Petitioner filed a Motion for Leave to File a Second Amended Petition. ECF No. 18. On January 20, 2026, during the pendency of his Motion for Leave to Amend, Petitioner filed a reply in further support of the Amended Petition. *See* Pet. Reply, ECF No. 19. On February 6, 2026, over Respondents' objection, *see* ECF No. 20, the Court granted Petitioner's Motion for Leave to Amend. ECF No. 23. On February 10, 2026, Petitioner filed the SAP. On March 2, 2026, Respondents filed a Supplemental Response to the SAP, which addressed only the newly added claim for habeas relief set forth in the SAP. Supp. Resp., ECF No. 30. Petitioner filed a reply to the Supplemental Response on March 9, 2026. Pet. Supp. Reply, ECF No. 32. On March 18, 2026, the Court held oral argument on the SAP. *See* ECF No. 24. At oral argument, the Court requested that Petitioner supplement the record with certain additional documentation, to wit, the complete evidentiary record submitted to the IJ in connection with

Petitioner's January 8, 2026 bond hearing (the "Bond Record").  It was unclear to the Court how it could assess Petitioner's argument that the Bond Record could not, as a matter of law and consistent with due process, support his detention, without knowing what was in the Bond Record. Petitioner submitted such supplemental documentation on March 19, 2026.[5]  *See* ECF No. 37.  The record, due in large part to Petitioner's comprehensive submissions, is hundreds of pages in length and includes police incident reports from three of Petitioner's law enforcement encounters.  *Id.*

**Standard of Review**

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003).  "Federal courts have jurisdiction to hear habeas corpus claims by noncitizens challenging the constitutionality of their detention." *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 290 (E.D.N.Y. 2025) (citing *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020).  "Additionally, claims that the discretionary process used to detain someone was constitutionally flawed are cognizable in federal court on habeas because they fit comfortably within the scope of [Section] 2241." *Id.* (citing *Velasco Lopez*, 978 F.3d at 850) (cleaned up).

**Discussion**

Petitioner seeks habeas relief on the basis that: (1) his arrest on December 19, 2025 violated his procedural due process rights under the Fifth Amendment; (2) his arrest at or near the Manchester Superior Court is otherwise barred by the INA, as well as the Tenth Amendment; and (3) his bond decision on January 8, 2026 was unsupported by clear and convincing evidence, and

---

[5]  Petitioner has requested that the unredacted Bond Record be filed under seal.  *See* ECF No. 37.  In connection with such request, Petitioner has filed for the Court's consideration both a redacted and unredacted version of the Bond Record.  *See* ECF Nos. 37, 38.  On June 17, 2026, the Court granted Petitioner's Motions to Seal.

therefore violated procedural due process.  In response, Respondents argue that: (a) Petitioner was afforded adequate process in connection with his arrest and detention on December 19, 2025; (b) the INA does not bar Petitioner's arrest and detention; (c) the SAP does not plausibly assert a Tenth Amendment violation; and (d) Petitioner's bond hearing on January 8, 2026 was fundamentally fair and comported with due process.

The SAP arises from two discrete events: Petitioner's arrest by ICE agents on December 19, 2025 at the Manchester Superior Court and his subsequent detention; and Petitioner's bond hearing in immigration court on January 8, 2026.  The Court will address these events, and the asserted grounds for habeas relief allegedly flowing therefrom, in turn.

The December 19, 2025 Arrest

There is no dispute that Petitioner was arrested and detained by ICE agents on December 19, 2025, pursuant to 8 U.S.C. § 1226(a) ("Section 1226(a)").  Petitioner argues that his arrest, which occurred at or near the Manchester Superior Court, was, for various reasons, constitutionally infirm.  The Court is not persuaded.

*Section 1226(a) and Procedural Due Process*

The Court first concludes that Petitioner's arrest and detention on December 19, 2025 did not violate his due process rights.[6]

---

[6] Petitioner does not appear to argue that his entitlement to notice and an opportunity to be heard regarding his initial bond revocation derives from Section 1226, and its accompanying regulations.  And for good reason, as "[s]uch a contention would be difficult to square with the text of the statute and regulations." *O.F.C. v. Almodovar*, No. 25-CV-9816 (LJL), 2026 WL 74262, at *6 (S.D.N.Y. Jan. 9, 2026).  Indeed, "[n]othing in the brief text of [Section 1226] and the accompanying regulations suggests that procedural protections such as notice of the intention to revoke [bond], service of the evidence justifying revocation, and a hearing before a neutral arbitrator are required prior to re-arrest and redetention." *Id.* (citing *Bermudez Paiz v. Decker*, No. 18-CV-4759 (BCM), 2018 WL 6928794, at *17 (S.D.N.Y. Dec. 27, 2018)); *see* 8 C.F.R. § 236.1(c)(9).  And while some process is required under Section 1226(b)—"namely, that there be an individualized determination regarding the noncitizen's dangerousness or risk of flight"—this Court "does not have the authority to second-guess the Government's individualized determination—only to ensure that it was made in the first instance." *O.F.C.*, 2026 WL 74262 at *7.  To be sure, Petitioner does assert that Respondents failed to make such an individualized determination.  But he advances this argument, as well as his argument regarding notice and an opportunity to be heard, under the Fifth Amendment's Due Process Clause, as opposed to the INA itself. *See* SAP at ¶¶ 88, 93.  The Court addresses those arguments below.

The Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. When evaluating a procedural due process claim, there are "two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022). "Courts in this Circuit have recognized that the Due Process Clause gives the noncitizen procedural rights in connection with the decision to deprive them of liberty." *Diallo v. Joyce*, No. 25-CV-9909 (AS), 2025 WL 3718477, at *4 (S.D.N.Y. Dec. 23, 2025) (collecting cases) (internal quotation marks omitted); *see also Velasco Lopez*, 978 F.3d at 850 ("the Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent."). "Relatedly, the Supreme Court has recognized that '[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.'" *Diallo*, 2025 WL 3718477 at *5 (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

To that end, the INA has "provided for discretionary detention pending removal proceedings since it was enacted in 1952. The statute providing for that detention is currently codified as [Section] 1226(a)." *Velasco Lopez*, 978 F.3d at 848. Section 1226 governs the detention of noncitizens, like Petitioner, who are "already in the country pending the outcome of

10

removal proceedings," and distinguishes between "two different categories" of detention.[7] *Jennings v. Rodriguez*, 583 U.S. 281, 288–89 (2018).  As relevant here, "[t]he first category is a discretionary detention framework established by  Section 1226(a)[,] . . . [which] provides that, for a noncitizen who is arrested and detained on a warrant issued by the Attorney General, the Attorney General: (1) may continue to detain the arrested noncitizen; (2) may release the noncitizen on bond; or (3) may release the noncitizen on conditional parole." *Rodriguez-Acurio*, 811 F. Supp. 3d at 292–93 (citing 8 U.S.C. § 1226(a)(1)–(2)).  "[T]he Attorney General's discretionary judgment regarding the application of [Section 1226] shall not be subject to review" and "[n]o court may set aside any action or decision by the Attorney General under this section regarding the . . . denial of bond or parole" of any noncitizen.  8 U.S.C. § 1226(e).  Nevertheless, "[w]hile the Government undoubtedly has authority to detain [noncitizens] under Section 1226," such noncitizens are "entitled to adequate procedural protections before being deprived of [their] liberty." *Mcdonald v. Francis*, No. 25-CV-9355 (JAV), 2025 WL 3295906, at *4 (S.D.N.Y. Nov. 26, 2025) (internal quotation marks omitted).

---

[7] The parties agree that Petitioner was detained pursuant to Section 1226(a), not pursuant to either Section 1225(b) or Section 1226(c), which provide for mandatory detention under certain circumstances.  Indeed, "Sections 1225 and 1226 are mutually exclusive—a noncitizen cannot be subject to both mandatory detention under [Section] 1225 and discretionary detention under [Section] 1226[a]." *Rodriguez-Acurio*, 811 F. Supp. 3d at 311 (citing *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 485 (S.D.N.Y. 2025)) (internal quotation marks omitted).  Thus, as noted above, this case differs from the scores of habeas petitions filed in federal courts across the country in the wake of DHS's recent shift in policy that Section 1225(b) and its mandatory detention framework broadly applies to noncitizens that, for decades, were previously considered subject to Section 1226(a)'s discretionary detention framework, *i.e.*, noncitizens, like Petitioner, that have been physically present in the United States for some time.  *See* ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission, *American Immigration Lawyers Association*, https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission (last visited June 16, 2026) ("Lyons Memo").  In cases challenging this position, courts in this Circuit have overwhelmingly rejected DHS's argument as to the applicability of Section 1225(b) and have held that Section 1226(a) applies to noncitizens discovered within the United States. *See Sidqui*, 2026 WL 251929 at *8 (collecting cases).  And most recently, the Second Circuit itself has also rejected DHS's position regarding mandatory detention, concluding unequivocally that Section 1226(a), not Section 1225(b)(2)(A), governs noncitizens "who are present in the United States after entering the country without inspection and admission, and who were not apprehended while entering the country or shortly thereafter." *Barbosa da Cunha v. Freden*, 175 F.4th 61, 69 (2d Cir. 2026).

Here, it is undisputed that ICE commenced removal proceedings against Petitioner on May 11, 2018; that Petitioner was thereafter released on bond; and that such bond was deemed breached and canceled years later, on October 6, 2022. Petitioner asserts that Respondents failed to make an individualized determination justifying his bond cancellation, and thus, did not exercise discretion in re-detaining him on December 19, 2025, pursuant to Section 1226(a). *See* SAP at ¶ 93. Petitioner also contends that Respondents failed to provide him with notice or an opportunity to be heard *before* arresting and re-detaining him. *Id.* at ¶¶ 91–92.

Petitioner's due process claim requires the Court to balance the distinct factors set forth in *Mathews v. Eldrige*: (1) "the private interest that will be impacted by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail." 424 U.S. 319, 335 (1976).

First, the Court concludes, and Respondents do not appear to contest, that Petitioner's liberty interest—impacted, of course, by his ongoing detention in ICE custody—is substantial, and likely exacerbated by his complicated family circumstances. *See* Pet. Reply at 3; *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty.") (internal quotation marks omitted); *see, e.g.*, *O.F.C.*, 2026 WL 74262 at *10 (liberty interests were heightened by petitioner's "family's specific circumstances," to include that petitioner was a primary caregiver and financial provider, as well as his wife's serious health problems). However, Petitioner's liberty interest is diminished to some extent by his multiple encounters with law enforcement and arrests in 2022 and 2025, which occurred after his release

12

on bond in 2018.  Indeed, while Petitioner's initial release from ICE custody may have constituted an "implicit promise" that his liberty would not be revoked unless he failed to live up to the conditions of his release, *see Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), Petitioner's interest in or expectation of remaining free on bond is surely undermined by his repeated encounters with law enforcement.  *Cf. Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1034, 1036 (N.D. Cal. 2025) (petitioner's liberty interest in remaining out of detention was "only heightened" by her post-release conduct, *e.g.*, becoming "a deeply valued member of her community, attending church weekly, making friends at her gym, and developing close relationships with coworkers at a company where she was recently named employee of the month").  However, given Petitioner's significant family obligations, his steady employment, his cooperation with the Hartford Police Department, and his still ongoing and significant health issues, on balance, the first *Mathews* factor—the nature of Petitioner's interest—counsels in Petitioner's favor.

The second *Mathews* factor requires the Court to consider the risk that Petitioner might be erroneously deprived of his liberty interest through the procedures used by Respondents in this case, as well as "the probable value, if any, of additional or substitute procedural safeguards."  *See* 424 U.S. at 335.  Here, the Court finds that Petitioner's risk of erroneous deprivation is *de minimis*, insofar as he: (a) was not, under the circumstances, entitled to notice and an opportunity to be heard *prior* to his arrest and detention; (b) received a post-deprivation bond hearing less than three weeks after his arrest and detention; and (c) has not otherwise met his burden of demonstrating that ICE did not appropriately exercise its discretion by conducting an individualized assessment of his case.

Petitioner challenges Respondents' failure to provide him with notice and an opportunity to be heard before detaining him on December 19, 2025.  But courts in this Circuit have held that

when a noncitizen is arrested and detained pursuant to Section 1226(a), due process does not require "notice or opportunity to contest detention *prior to* arrest."[8]  *See Vizhco Chunchi v. Francis*, No. 25-CV-10249 (ER), 2026 WL 249676, at *2 (S.D.N.Y. Jan. 30, 2026) (emphasis in original).  Indeed, "the Supreme Court has specifically held that a *prompt post-arrest hearing* is sufficient in the context of revoking certain forms of conditional liberty." *O.F.C.*, 2026 WL 74262 at *8 (applying *Morrissey* in the civil immigration habeas context, "given the parallels between parolees and noncitizens who are convicted of crimes while released on bond").  As observed in *O.F.C.*, the Supreme Court's decision in *Morrissey* "undermines Petitioner's contention that a pre-arrest hearing was required here."[9]  *Id.*  Moreover, it is undisputed that Petitioner received a post-

---

[8]  In support of this argument, Petitioner relies on several cases in which courts purportedly "held that ICE re-detention of a person previously released by a bond order of an Immigration Judge, without meaningful notice or an opportunity for hearing before re-detention, violates procedural due process."  *See* SAP at ¶ 87.  These cases are largely inapposite. In several of them, the petitioners were purportedly detained under a mandatory detention framework, *see O.F.C.*, 2026 WL 74262 at *13; and/or the detention of the petitioner was unsupported by any "material or individualized change in circumstance," *see Lesic v. LaRose*, No. 25-CV-2746 (LL), 2025 WL 3158675, at *2 (S.D. Cal. Nov. 12, 2025). By contrast, here, Petitioner was detained pursuant to Section 1226(a) and its discretionary detention framework, and as set forth below, he has not demonstrated that ICE failed to appropriately exercise its discretion in re-detaining him in light of events which post-date his initial bond.

The Court additionally observes that, to the extent due process might require Respondents to provide Petitioner with notice of his bond breach, such a requirement was likely satisfied here.  There is no dispute that notices of Petitioner's ICE check-ins and ensuing bond breach were sent by certified mail to his third-party bond obligor.  Petitioner does not assert that the terms of the bond required that such notices be provided to Petitioner as well, or his counsel.  And pursuant to 8 C.F.R. § 103.6(e), notification of a bond breach determination need only be provided to the bond obligor. And it is utterly unclear that due process would impose additional obligations upon Respondents, beyond their compliance with the original terms of the bond and 8 C.F.R. § 103.6(e), simply because Petitioner's bond obligor became, unbeknownst to Respondents, defunct.  In short, it appears Petitioner got precisely the notice he bargained for when enlisting his obligor.  Nevertheless, the Court need not—and does not—reach this issue. *See Vizhco Chunchi*, 2026 WL 249676 at *2.

[9]  In *O.F.C.*, which this Court finds instructive, Judge Liman analyzed the process owed to "noncitizens released on bond who have been convicted of crimes while on release," but expressly did not address "whether the same set of procedures applies outside the context of noncitizens who have been convicted of a crime while released on bond." 2026 WL 74262 at *12.  Here, there is no dispute that Petitioner was not convicted of any crime in connection with his multiple arrests. But the Court finds that the analysis in *O.F.C.* applies to Petitioner's circumstances with equal force.  In *O.F.C.*, Judge Liman invoked the well-settled principle that criminal defendants who have been paroled or released on bond are still entitled to process in connection with any ensuing efforts to re-detain them in light of acts committed while released from criminal confinement. *See id.* at *7 (citing *Morrissey*, 408 U.S. at 482).  In analogizing *Morrissey* and its progeny to the civil immigration habeas context, Judge Liman looked broadly to the noncitizen's *conduct* on release, not solely to whether such conduct resulted in a *conviction*.  And such a reading of *O.F.C.* is consistent with *Morrissey* itself, which evaluated the process owed to parolees who "*committed acts* that would constitute a violation of parole conditions." *Morrissey*, 408 U.S. at 485 (emphasis added).

arrest bond hearing on January 8, 2026, less than three weeks after his arrest.[10]  Thus, when assessing the second *Mathews* factor, Petitioner's prompt post-arrest bond hearing significantly diminishes any risk of erroneous deprivation.

It is also well-settled that DHS has wide latitude in exercising its discretion pursuant to [Section] 1226(a)," and that "prior to an order of removal, the release of an inadmissible alien may be revoked at any time at [DHS's] discretion." *Vizhco Chunchi*, 2026 WL 249676 at *2 (citing 8 C.F.R. § 236.1(c)(9)).  Thus, to the extent Petitioner was not entitled to pre-arrest notice and an opportunity to be heard, and because he received a prompt post-arrest bond hearing, it follows that his risk of erroneous deprivation, and in turn, his due process claim, rests principally on whether ICE validly exercised its discretion in deciding to arrest and detain Petitioner.  *O.F.C.*, 2026 WL 74262 at *13 ("[e]ven if Petitioner was not entitled to a pre-arrest hearing with prior notice, his initial detention might still have been unlawful from its inception if, contrary to the INA and its implementing regulations, he was detained without an individualized determination of changed circumstances."); *Rodriguez-Acurio*, 811 F. Supp. 3d at 317 ("the purpose of requiring an exercise of discretion under Section 1226(a) prior to the decision to detain a noncitizen who is not subject to mandatory detention is to prevent an erroneous deprivation of liberty.") (citation, internal quotation marks, and alterations omitted).  The Court is not persuaded that Petitioner has met his burden in this regard.  *See O.F.C.*, 2026 WL 74262 at *14 ("on a petition for a writ of habeas corpus, the petitioner bears the burden of proving his allegations by a preponderance of the evidence.").

---

[10]  Petitioner asserts that his post-arrest bond hearing was inadequate insofar as it did not allow him to challenge his bond revocation, *i.e.*, the basis for his re-arrest, for which he claims he did not receive any notice.  Pet. Reply at 3–4. But as discussed herein, Petitioner was not constitutionally (or statutorily) entitled to notice prior to his arrest, much less prior to any threshold determination that his bond had been breached.  *See* 8 C.F.R. § 103.6(e).  And in any event, the bond hearing on January 8, 2026—at which DHS bore the burden of proof—provided Petitioner with an adequate opportunity to argue that he remained neither a flight risk nor a danger to the community, and should be released pending removal proceedings.

According to Respondents, ICE's initial decision to revoke Petitioner's bond was made in light of his May 4, 2022 arrest, and his ensuing failure to appear at two ICE check-ins. *See* OSC Response at 4 (citing Chan Decl. at ¶¶ 11–14). At that time, ICE intended to arrest and detain Petitioner for his bond breach, but was not aware of his location. *See* Chan Decl. at ¶ 17. Nearly three years later, following two subsequent encounters with law enforcement on May 5, 2025 and August 4, 2025 (the latter triggering an Immigration Alien Response), ICE made the decision to target Petitioner for arrest and detention. OSC Response at 4–5 (citing Chan Decl. at ¶¶ 16–17). Here, unlike many other cases where ICE arrests of noncitizens were made without evidence of changed circumstances, *e.g.*, that the noncitizen had violated the terms of their release on bond, it is undisputed that Petitioner's arrest on December 19, 2025 followed his failure to appear at multiple ICE check-ins, his subsequent bond breach, and several arrests by local law enforcement. And indeed, for those reasons, on December 18, 2025, DHS issued an I-200 Warrant for Petitioner's arrest. *See* Pet. Reply, Ex. A, ECF No. 19-1. Moreover, "this is not a situation in which [ICE], at the initial point of re-arrest, was operating under the assumption that Petitioner was subject to mandatory detention under the operative statute. Rather, [ICE] would have believed that [Petitioner's] re-detention required an exercise of discretion including an individualized determination of changed circumstances." *O.F.C.*, 2026 WL 74262 at *13. This record evidence supports the conclusion that an individualized determination to detain Petitioner was made, and Petitioner has put forth scant evidence indicating otherwise. Accordingly, Petitioner has failed to meet his burden, and the second *Mathews* factor weighs in Respondents' favor. *Cf. Sidqui*, 2026 WL 251929 at *15 ("Petitioner's re-detention . . . without any individualized assessment such as any change in circumstances from his initial release . . . or procedure establishes a high risk of erroneous deprivation of his protected liberty interest.") (internal quotations omitted); *see also*

*Luna Sanchez v. Bondi*, No. 25-CV-18888 (MSN), 2025 WL 3191922, at *5 (E.D. Va. Nov. 14, 2025) ("[t]here is a substantial likelihood that, by allowing DHS to arbitrarily revoke Petitioner's bond and detain him without any individualized findings, Petitioner will be erroneously deprived of liberty.").

Finally, the Court must consider Respondents' countervailing interests, "including the function[s] involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. It is well-established that Respondents have legitimate regulatory interests in detaining noncitizens pursuant to Section 1226(a) to ensure that they do not abscond, or commit crimes. *See Velasco Lopez*, 978 F.3d at 854. "However, [Respondents] [have] little interest in detaining a noncitizen who was previously determined to be neither a flight risk nor dangerous, . . . without an individualized determination of risk of flight and dangerousness." *Sidqui*, 2026 WL 251929 at *15. Put differently, insofar as noncitizens released on bond have been determined to be neither a flight risk nor dangerous, the Government's interest in re-detaining them is minimal, absent demonstrable changed circumstances and an individualized reassessment as to the noncitizens' flight risk and dangerousness. Here, as set forth *supra*, Petitioner has not sufficiently demonstrated that, prior to his re-detention, Respondents failed to make an individualized, discretionary determination as to Petitioner's purported dangerousness. Indeed, to the contrary, Respondents have submitted evidence supporting the conclusion that such an individualized determination *was* made. And at Petitioner's post-deprivation bond hearing, the IJ also concluded that Respondents had put forth clear and convincing evidence as to Petitioner's dangerousness. Under these circumstances, Respondents have shown a sufficient interest in Petitioner's continued detention. *Cf. id.* (the government "failed to show a significant interest in [p]etitioner's continued detention" where it

17

did not offer "any evidence that [p]etitioner is a danger to the community," and the record evidence "show[ed] the opposite of a flight risk"). Accordingly, the third *Mathews* factor weighs in Respondents' favor.[11]

The Court has considered the substantial liberty interests at stake for Petitioner, and is mindful that the termination of his liberty "inflicts a grievous loss on the individual and often on others." *O.F.C.*, 2026 WL 74262 at *7 (quoting *Morrissey*, 408 U.S. at 482). Nevertheless, Respondents have demonstrated their own countervailing interests in Petitioner's continued detention. And because Petitioner was not entitled to pre-deprivation notice and an opportunity to be heard, and has otherwise failed to demonstrate that ICE detained him without any exercise of discretion, there is little risk that his continued detention represents an erroneous deprivation of his liberty. *See Mathews*, 424 U.S. at 335. Thus, on balance, the Court concludes that Petitioner's

---

[11] The Court agrees with Judge Liman's observation in *O.F.C.*, that "the short period during which the Government's interests might outweigh countervailing ones does not extend beyond the time needed for the Government to process the paperwork and evidence in its possession demonstrating that the individual presents a danger or flight risk." 2026 WL 74262 at *11. As such, the Court finds that Respondents' interests were not outweighed by Petitioner's interests during the reasonably short twenty-day period between his arrest and his bond hearing.

due process rights under the Fifth Amendment were not violated when he was arrested and

detained by ICE on December 19, 2025.  The SAP is **DENIED** in this regard.[12] [13]

*INA and the Courthouse Privilege*

Petitioner asserts that Respondents violated the INA by arresting Petitioner when he sought

to appear at the Manchester Superior Court for a criminal court proceeding.  More specifically,

---

[12]  Petitioner argues that his Form I-323 Notice is invalid because it was signed by an SDDO, not the ICE District Director as required by 8 C.F.R. § 103.6(e), or any of the enumerated senior ICE officials otherwise expressly authorized to approve re-detention.  *See* SAP at ¶ 42.  In this regard, Petitioner asserts that his re-detention "violates ICE's own regulations."  *Id.* at ¶ 52.  Respondents contend, based on their interpretation of the INA and its accompanying regulations, that an SDDO was properly authorized to order Petitioner's re-detention.  *See* OSC Response at 11 n.2.  Even assuming that Petitioner is correct, which the Court does not decide, the Court declines to find a due process violation based solely on ICE's failure to adhere, in this isolated instance, to its own regulations. *See McDarby v. Dinkins*, 907 F.2d 1334, 1337–38 (2d Cir. 1990) (where minimal elements of due process have otherwise been met, an agency's failure to adhere to its own regulations does not, of itself, violate due process).

[13]  Petitioner further argues that *ICWC* is "relevant" to his initial due process claim, primarily because the restored "2021 Directive" "confirms that the first and third *Mathews* factors weigh in favor of Petitioner."  *See* ECF No. 46 at 5.  The Court is not persuaded that *ICWC* alters the outcome of the SAP, as set forth herein.  As an initial matter, the Court observes that the operative SAP does not assert a claim under the APA or otherwise cite to Petitioner's pending U visa application as a basis for habeas relief, and Petitioner has expressly indicated that he is not seeking to amend the SAP to assert such a claim.  *See* ECF No. 46 at 3.  Turning to the *Mathews* factors, the Court has already determined that the first factor weighs in Petitioner's favor.  As to the third *Mathews* factor, Petitioner contends that the restoration of ICE's 2021 Directive confirms that additional "feasible and non-burdensome" procedures were available to Respondents.  Petitioner essentially argues that the 2021 Directive provided such a feasible and non-burdensome procedure.  This is a policy argument as to the relative merits of the 2021 Directive and the 2025 Guidance.  But the third *Matthews* factor does not turn on such policy considerations.  And since the 2021 Directive was rescinded at the time ICE arrested and detained Petitioner on December 19, 2025, it was not an available alternative.  Further, while Petitioner is correct that the 2021 Directive "generally bars enforcement action" against noncitizens with pending U visa applications, unless "exceptional circumstances" exist, *e.g.*, if the noncitizen "poses an articulable risk of death, violence, or physical harm to any person," Respondents have now indicated (and Petitioner does not appear to dispute) that following *ICWC*, in accordance with the reinstated 2021 Directive, ICE "conducted a review under the victim-centered approach" and concluded that Petitioner "poses an articulable risk of death, violence, or physical harm to any person" and shall remain in ICE custody.  *See* ECF No. 47 at 4.  Respondents have also stated that ICE will submit a request to USCIS to expedite consideration of Petitioner's U visa application, consistent with the 2021 Directive.  *See id.*  To be sure, on the record before it, the Court is ill-equipped to weigh ICE's post-*ICWC* finding that Petitioner, in fact, poses an articulable risk of death, violence, or physical harm.  But the Court is not authorized to review such discretionary determinations, and thus, whether Petitioner or the Court agree with such determination is immaterial to the constitutionality of Petitioner's continued detention, and the adjudication the SAP.  Additionally, the Court declines to address Petitioner's new claim that under *ICWC*, ICE's failure to adhere to the 2025 Guidance, pursuant to which ICE was required to consult with the Office of Principal Legal Advisor ("OPLA") prior to arresting Petitioner notwithstanding his pending U visa application violated his due process rights, as no such claim was made in the SAP. Petitioner is free to seek relief under *ICWC* as a member of the Pending Petition Class.  The non-final order in *ICWC* "is not subject to preclusive effect in this proceeding." *J.R.S.B. v. Olson*, No. 26-CV-478 (CCB), 2026 WL 1481267, at *4 n.5 (N.D. Ind. May 27, 2026) (citing *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).

Petitioner challenges his arrest as violating a common law privilege against civil arrests at courthouses, which Petitioner contends is incorporated into the INA.  The Court is not persuaded.

Specifically, Petitioner contends that the hoary common law privilege against civil arrests in and around courthouses was well-established when Congress enacted the INA in 1952, and that as such, the privilege is incorporated into the statute.  Respondents argue that the common law privilege has evolved and narrowed since its adoption from English common law, and had thus become a "historical artifact" by the time Congress enacted the INA, such that the privilege is not sufficiently "long-established and familiar" to have been presumptively retained in the INA's statutory civil arrest framework.  The Court agrees with Respondents.

"[W]here a common law principle is well-established,  . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident."  *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (internal quotation marks omitted); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) ("statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.") (internal quotation marks omitted).  "[A] court should apply the presumption that Congress intended to retain a common law rule only if that rule was 'long-established and familiar' *at the time of the statute's enactment*."  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 20 (1st Cir. 2020) (emphasis added) (citing *Pasquantino v. United States*, 544 U.S. 349, 359–60 (2005)).  "In determining whether a statute 'invades' or enters a field addressed by common law, courts look to whether the purpose and rationale of the common law apply to the statutory context in which Congress was legislating."  *United States v. New York*, 810 F. Supp. 3d 329, 345 (N.D.N.Y. 2025) (citing *Pasquantino*, 544 U.S. at 360, 368–72).

As relevant here, there is no question that "[t]he text of the INA confers broad authority upon ICE to conduct civil arrests." *Ryan*, 974 F.3d at 19 (citing 8 U.S.C. §§ 1226(a), 1357(a)(2)). It is also true that "[t]he INA does not contain the requisite clear and manifest congressional purpose to preempt the . . . common law privilege against civil courthouse arrests," and that "the two civil arrest provisions in the INA—Sections 1226 and 1357—authorize arrests with and without a warrant respectively but do not speak to arrests in and around courthouses *in any way*."[14] *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 692 (S.D.N.Y. 2020) (emphasis in original). Yet, a closer look at the underlying purpose and subsequent evolution of the so-called courthouse arrest privilege reveals that it was not so "long-established and familiar" so as to be necessarily incorporated into the INA.

First, the privilege did not apply to *all* types of civil arrests in courthouses. In fact, in Connecticut and elsewhere, there existed no common law privilege against civil arrests, immigration-related or otherwise, of *criminal defendants* attending their own criminal court proceedings. *See Ryan v. Ebecke*, 102 Conn. 12, 15 (1925) (declining to afford immunity from civil suit "to persons under bail who attend court to be tried on criminal charges," thus keeping "the rule of privilege within the reason upon which it rests") (citing *Netograph Mfg. Co. v. Scrugham*, 197 N.Y. 377, 381 (1910)); *Moore v. Green*, 73 N.C. 394, 394 (1875); *Scott v. Curtis*, 27 Vt. 762, 763 (1855)). This alone would defeat the notion that the INA, even if it incorporated

---

[14] For this reason, and because "the INA provides *no* indication that Congress intended to abrogate the common law privilege against civil courthouse arrests," some courts in this Circuit have concluded that the INA incorporates such privilege. *Doe*, 490 F. Supp. 3d at 692 (emphasis in original); *see also State v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 391 (S.D.N.Y. 2019). The Court respectfully disagrees with reasoning advanced by its distinguished colleagues in such cases. In neither case was there any discussion of whether the privilege extended to defendants in criminal proceedings present at the courthouse. And nor did either case address what the Court views as the meaningful distinction, between civil arrests generally and civil arrests *by the sovereign*.

21

some form of the common law privilege, precluded the arrest of Petitioner at or near the Manchester Superior Court, where he was a defendant in a pending criminal case.[15]

Further, a historical analysis of the privilege against civil arrests at courthouses leads to the conclusion that the INA did not prohibit Petitioner's arrest. Historically, "[a]t common law, a plaintiff in a civil action obtained personal jurisdiction over a defendant by means of a writ of capias ad respondendum," which "directed the sheriff to secure the defendant's appearance by taking him into custody." *Ryan*, 974 F.3d at 21 (citation omitted). In order "to encourage people, . . . to appear in court voluntarily," *Golodner v. Women's Ctr. of Se. Connecticut, Inc.*, 281 Conn. 819, 829 (2007), the common law privilege against such arrests developed. *See Doe*, 490 F. Supp. 3d at 691 ("the privilege evolved as a means to encourage parties, as well as witnesses, to appear in court voluntarily and to enable the proper, expeditious, and uninterrupted functioning of courts."). Such practice of arresting parties as a means of securing personal jurisdiction in civil suits—and with it, "the vitality of the common law privilege against courthouse arrests"— "persisted to some degree" into the early twentieth century. *See Ryan*, 974 F.3d at 22 (collecting cases). Yet, over time, civil arrests "fell largely out of fashion," as "personal service of a summons generally supplanted the writ of capias ad respondendum as the method for securing personal jurisdiction over a defendant in a civil action." *Id.*; *see also State*, 431 F. Supp. 3d at 390. Nevertheless, even after this shift, the majority of courts "recogniz[ed] that the threat of service of

---

[15]  In view of this precedent, Petitioner urges this Court to certify the following question to the Connecticut Supreme Court: "[d]oes the state common law privilege against civil arrests at courthouses extend to misdemeanor criminal defendants?" Pet. Reply at 7. Petitioner asserts that *Ebecke* provides insufficient guidance on the controlling question, and that the question presented implicates public policy concerns, and involves issues that are likely to recur in subsequent state and federal litigation. *See id.* at 7–8. However, the question as to the scope of the privilege against civil arrests in courthouses, as it exists today, is largely irrelevant to the question of whether the privilege was incorporated into the INA in 1952. Nor is the purpose of certification to give the Connecticut Supreme Court the opportunity to change its current precedent. *Sakon v. Johnson*, No. 3:23-CV-107 (AWT), 2024 WL 3090478, at *3 (D. Conn. June 21, 2024). And while the Court agrees with Petitioner that "weighty public policy considerations [are] implicated in the rights of noncitizens to access courthouses," the Court nevertheless, in its discretion, *see Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974), declines to certify the question presented to the Connecticut Supreme Court.

a summons still risked chilling court attendance," and extended the privilege to protect "suitors, as well as witnesses" from "service of civil process while in attendance upon court, and during a reasonable time in coming and going." *Ryan*, 974 F.3d at 22 (collecting cases).

In light of the foregoing, by the time Congress enacted the INA in 1952, the common law privilege against civil arrests, even if "long-established and familiar" in some form had arguably been modernized and modified to be a privilege against personal service of a summons at courthouses. However, the Court "need not make a definitive ruling in this regard," *id.* at 23, insofar as, more simply, Petitioner has not shown that it was clear in 1952 that the common law privilege had any application to the immigration-related arrest by the sovereign that occurred in this case. Indeed, as in *Ryan*, Petitioner does not offer any "pre-1952 case law from an American court that directly addresses the applicability of the privilege to . . . civil arrests *on behalf of a sovereign*." 974 F.3d at 24 (emphasis in original). Absent such authority, it cannot be said that any such privilege was "long established and familiar," and thus, was incorporated into the INA, which, as discussed above, clearly authorizes such civil arrests. *See id.* at 20 ("the nonderogation canon does not give courts carte blanche to read a grab bag of common law rules into federal statutes simply to effectuate what those courts may perceive as good policy."); *Pasquantino*, 544 U.S. at 359–60. In fact, relevant pre-1952 case law regarding the common law privilege almost universally involved private civil suits, as opposed to arrests made on behalf of the sovereign, for law enforcement purposes. *See Ryan*, 974 F.3d at 22 (collecting cases). In this vein, it bears repeating that "[i]n determining whether a statute 'invades' or enters a field addressed by common law, courts look to *whether the purpose and rationale of the common law apply to the statutory context in which Congress was legislating*." *United States v. New York*, 810 F. Supp. 3d at 345 (emphasis added) (citation omitted). As discussed, there is no authority to support the conclusion

23

that the common law privilege on which petitioner relies applied "to the statutory context in which Congress was legislating," *i.e.*, immigration enforcement.

Additionally, the Court observes that in 2006, the INA was amended to add subsection (e) to Section 1229, and though that provision broadly concerns the initiation of removal proceedings, subsection (e) expressly contemplates that a notice to appear may be served "[a]t a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with," *inter alia*, certain types of "civil or criminal case[s]." *See* 8 U.S.C. § 1229(e)(2)(B). And as Judge Castel has aptly observed, "if the INA had incorporated a privilege against service of process at courthouses, it would not have blithely adopted a requirement that a written disclosure accompany the service at a prohibited location, *i.e.*, a courthouse."[16] *Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362, 390 (S.D.N.Y. 2025), *modified on other grounds by Afr. Communities Together v. Lyons*, No. 25-CV-6366 (PKC), 2026 WL 1382944, at *3 (S.D.N.Y. May 18, 2026).

For all of these reasons, the Court concludes that Petitioner's arrest by ICE on December 19, 2025 did not violate the INA. The SAP is **DENIED** in this regard.

*Tenth Amendment*

Petitioner next argues that his arrest at or near the Manchester Superior Court "interfered with core functions of the state government of Connecticut," to wit, the state's administration of justice in his criminal case, and therefore violated the Tenth Amendment. *See* SAP at ¶ 102. More specifically, Petitioner asserts that ICE's recent "Courthouse Arrests Directive" (the "Directive")[17]

---

[16] The Court agrees with Judge Castel, and Respondents, *see* OSC Response at 26 n.3, that the 2006 amendment was not an attempt to abrogate the common law privilege altogether, but rather, constituted a "legislative recognition that the INA never incorporated such a privilege" in the first place. *Afr. Communities Together*, 799 F. Supp. 3d at 390 n.17.

[17] *See* Memorandum of Todd M. Lyons, Acting Director of ICE, dated May 27, 2025, https://www.ice.gov/doclib/foia/policy/11072.4.pdf (last accessed June 16, 2026).

"impermissibly commandeers the state's resources to carry out a federal regulatory program of immigration enforcement." *Id.* at ¶ 106. The Court disagrees.

The Tenth Amendment declares that all "powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. Fundamentally, the Tenth Amendment prohibits the federal government from compelling a state "to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Known as the "anticommandeering doctrine," the Tenth Amendment "withhold[s] from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). "Nor can it conscript state or local officers directly, or coerce States to action through improper influence." *United States v. New York*, 810 F. Supp. 3d at 354 (cleaned up) (citing *Printz*, 521 U.S. at 935; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012)).

Here, Petitioner asserts that he was arrested in a parking lot at the Manchester Superior Court, in accordance with the Directive, which encourages and directs ICE agents regarding immigration enforcement activities in or near courthouses. *See* Pet. Reply at 6. In particular, Petitioner challenges the Directive's guidance that ICE agents "take advantage" of courthouses' security screening measures, and utilize their non-public entrances and exits. In this regard, Petitioner contends that ICE "'reap[ing] the benefits of the work of state employees' in this manner . . . is 'no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives.'" Pet. Reply at 9–10 (quoting *United States v. New York*, 810 F. Supp. 3d at 355). Respondents, for their part, emphasize that the Directive does not actually compel any state actors to take or refrain from taking any specific action, much less require state actors to "make criminal defendants available for arrest or otherwise assist ICE's enforcement

25

efforts." *See* OSC Response at 28.  Even if Petitioner's argument holds sway, which the Court does not decide, it is undisputed that Petitioner was not arrested inside of the Manchester Superior Court.  This distinction matters.  Indeed, at the time of his arrest, Petitioner had not gone through any screening or security measures inside the courthouse, nor is there any suggestion that before or after his arrest, ICE agents utilized non-public courthouse entrances or exits in connection with their enforcement activities.  Thus, it simply cannot be said that ICE, in effectuating Petitioner's arrest, reaped the benefits of the work of state employees, or otherwise commandeered any state officials.  *See Connecticut v. Physicians Health Servs. Of Connecticut, Inc.*, 287 F.3d 110, 122 (2d Cir. 2002) (finding that a federal law did not violate the Tenth Amendment "because it impose[d] no affirmative duty of any kind on any" branch of state government); *see also City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (discussing the scope and purpose of Tenth Amendment protections), *cert. denied*, 528 U.S. 1115 (2000).  Accordingly, Petitioner's arrest on December 19, 2025 did not run afoul of the Tenth Amendment.  The SAP is **DENIED** in this regard.

Petitioner's Bond Hearing

Next, the Court turns to Petitioner's bond hearing on January 8, 2026.  As discussed above, there is no dispute that following Petitioner's arrest and ICE's subsequent decision to detain him without bond, Petitioner requested a bond hearing pursuant to 8 C.F.R. § 236.1(d)(1), and received such a hearing less than three weeks later, on January 8, 2026.  At the conclusion of the hearing, the IJ denied Petitioner bond, having concluded that DHS presented clear and convincing evidence that Petitioner was a danger to the community. Petitioner appealed the IJ's decision and the appeal remains pending at the BIA.  Petitioner contends that the IJ's denial of bond was based on

26

inaccurate, uncorroborated, and incomplete evidence, and as such, violated Petitioner's due process rights under the Fifth Amendment.  The Court disagrees.

The Court has limited authority to review Petitioner's bond denial.  It may "review the IJ's discretionary bond denial only where that bond denial is challenged as legally erroneous or unconstitutional."  *Arellano v. Sessions*, No. 18-CV-6625 (MAT), 2019 WL 3387210, at \*7 (W.D.N.Y. July 26, 2019) (citation and internal quotation marks omitted); *see also Jorge S. v. Sec'y of Homeland Sec.*, No. 18-CV-1842 (HB), 2018 WL 6332717, at \*5 (D. Minn. Nov. 15, 2018) ("[T]his Court cannot review whether the IJ was correct or reasonable in her final decision to order [petitioner] held without bond.  This Court *may* review, though, whether the IJ applied the correct legal standards in making that decision.") (emphasis in original).  As relevant here, noncitizens can make this showing by demonstrating that the IJ erred because the evidence itself could not—as a matter of law—have supported the IJ's decision to deny bond.  *See Cepeda v. Shanahan*, No. 15-CV-9446 (AT), 2016 WL 3144394, at \*2 (S.D.N.Y. Apr. 22, 2016).  However, it is well-settled that district courts have "no authority to encroach upon an IJ's discretionary weighing of the evidence." *See Arellano*, 2019 WL 3387210 at \*7 (citing *Torres-Aguilar v. I.N.S.*, 246 F.3d 1267, 1271 (9th Cir. 2001)).  Indeed, "[g]iven the highly circumscribed nature of judicial review in this context, courts cannot override an immigration judge's bond decision simply because they 'might have reached a different result if considering the issue de novo or in the context of a bail review in a criminal case.'"  *Hernandez-Azuaje v. Hyde*, No. 25-CV-13224 (ADB), 2026 WL 221833, at \*1 (D. Mass. Jan. 28, 2026) (quoting *Massingue v. Streeter*, No. 19-CV-30159 (KAR), 2020 WL 1866255, at \*5 (D. Mass. Apr. 14, 2020)).

Under the foregoing "highly circumscribed" standard of review, this Court concludes that the IJ's determinations here, as set forth both at the bond hearing and in her ensuing written

27

memorandum, did not violate Petitioner's due process rights. In reaching her bond decision, the IJ acknowledged that Petitioner had not been convicted of any violent crimes, and that any crimes for which he had been arrested were disposed of through accelerated rehabilitation programs, but nevertheless underscored the significance of Petitioner's immigration and criminal history. *See* Pet. Supp. Reply, Ex. C, ECF No. 32-1 at 13–16. In particular, the IJ observed that Petitioner "has developed a lengthy criminal history" since entering the United States in 2015, to include a youthful offender adjudication related to sexual assault allegations where Petitioner completed three years of probation; a December 4, 2021 interaction with law enforcement in which Petitioner was the passenger in a car with firearms; and two traffic-related incidents in 2025 in which Petitioner nearly caused motor vehicle accidents and was non-compliant with officers. *See id.* at 16. Ultimately, the Court is satisfied that the IJ applied the correct legal standard—she held the Respondents to the burden of establishing dangerousness by clear and convincing evidence—and that, in considering the foregoing, the IJ did not rely on evidence that could never alone satisfy that standard as a matter of law. *See Medley v. Decker*, No. 18-CV-7361 (AJN), 2020 WL 1033344, at *3 (S.D.N.Y. Mar. 3, 2020) ("the Court cannot conclude that the evidence the [IJ] relied upon in reaching his conclusion *could not possibly* establish by clear and convincing evidence that Mr. Medley posed a danger to the community.") (emphasis in original) (citation omitted); *see also Raspoutny v. Decker*, 708 F. Supp. 3d 371, 378 (S.D.N.Y. 2023) ("Under BIA precedent, an IJ has broad discretion in deciding the factors that he or she may consider in custody redeterminations, including evidence of crimes for which Petitioner was not convicted.") (citation and internal quotation marks omitted). Indeed, "[e]ven though the Court might, on direct review (and with the benefit of more information and context), weigh this evidence differently, it cannot say that the [IJ]'s conclusion that it amounted to clear and convincing evidence of dangerousness

was so arbitrary that it would offend fundamental tenets of due process." *Hernandez-Azuaje*, 2026 WL 221833 at \*2 (citation and internal quotation marks omitted).[18]

Petitioner principally challenges the IJ's purported reliance on "uncorroborated police reports" in arriving at her bond decision.  At bottom, Petitioner claims that the IJ violated due process by affording significant weight to the police reports alone, absent corroborating evidence of the allegations contained therein.  In doing so, Petitioner relies upon a handful of out-of-circuit decisions from the District of Rhode Island, and the First Circuit's decision in *Rosa v. Garland*, 114 F.4th 1 (1st Cir. 2004).[19]  The Court is not persuaded.  First, Petitioner cites to no Second Circuit case directing that "uncorroborated police reports" (however that phrase might be defined) are per se constitutionally insufficient to form the basis of a bond denial.  By contrast, "[w]hile courts in [the Second Circuit] caution against giving substantial weight to police reports, there is no bright line rule precluding an IJ from basing a dangerousness determination on a police report." *Portillo Melara v. Tellez*, No. 26-CV-1453 (AMD), 2026 WL 1146054, at \*6 (E.D.N.Y. Apr. 28, 2026).

More importantly however, the IJ did not rely solely on "uncorroborated police reports." Respondents did provide the IJ with various police reports from three of Petitioner's law

---

[18]  To be sure, Petitioner submitted to the IJ a lengthy, compelling and comprehensive case for release and this Court may well have reached a different decision than was reached by the IJ.  But any disagreement with the decision does not and cannot equate with a due process violation.

[19]  Petitioner also relies on a decision from the Board of Immigration Appeals, *Matter of Rodriguez Pena (In re Pena)*, 29 I. & N. Dec. 358 (BIA 2025), which he describes as "cautioning that IJs not give substantial weight to [an] arrest or police report absent conviction or corroborating evidence of the allegations contained therein."  SAP at ¶ 75. Petitioner is wrong, and if anything, this decision *supports* the IJ's denial of bond.  As an initial matter, *In re Pena* is procedurally inapposite, insofar as there, the BIA concluded that Pena was *not eligible* for bond.  In doing so, the BIA agreed with the IJ's assessment that prior arrests identified in Pena's background check were "not particularly probative of [] dangerousness." 29 I. & N. at 359.  However, it made such findings because the record did "not contain police reports for, or other information describing the circumstances of, these arrests." *Id.*  From there, the BIA *did* consider evidence in the record regarding a more recent arrest of Pena, including the sworn statements of his arresting officers.  *Id.* at 359–60.  Further, the BIA remarked that "it is well established that specific, probative, and reliable evidence of criminal conduct that has not produced a conviction may show that an individual poses a danger to the community." *Id.* at 360.

enforcement encounters – some of which, notably, were duly sworn. *See* ECF No. 38-5. But the IJ also had much of Petitioner's Immigration File; his U visa application; and his own submission to DHS, in which Petitioner himself provided details regarding each of his arrests, charges, dispositions, and other encounters. *See* ECF Nos. 38-2, 38-3. While the police reports themselves add context and detail to a subset of those encounters, they cannot be fairly characterized as "uncorroborated." And in her decision, the IJ made clear that she did not rely solely on Petitioner's law enforcement encounters as described in the applicable police reports. Rather, the IJ relied more broadly on the "lengthy criminal record" that Petitioner has developed since entering the United States, to include not only the facts underlying his arrests in 2021 and 2025, but also his "youthful offender adjudication related to sexual assault allegations where he completed three years of probation." Pet. Supp. Reply, Ex. C, IJ Bond Memo at 4; *see also Vargas v. Davies*, No. 15-CV-3525 (ER), 2016 WL 3044850, at *4 (S.D.N.Y. May 27, 2016) (IJ is not proscribed from "assessing the totality of a detainee's prior criminal history, including arrests and unarraigned charges, in determining danger to the community").

Relatedly, Petitioner more broadly urges that due process is violated where a bond decision is premised on evidence which, as a matter of law, is not probative of dangerousness. But once again, the Court is not convinced that the evidence relied upon by the IJ here was so lacking as to deprive Petitioner of due process. And the Court agrees with Respondents that, by conceding the admissibility of DHS's evidence, *see* Pet. Supp. Reply at 4, Petitioner is necessarily challenging the IJ's discretionary weighing of such evidence in her bond decision, which is not subject to review by this Court. *See Arellano*, 2019 WL 3387210 at *7.

Lastly, Petitioner asserts that the IJ erroneously relied on materially false assertions made by DHS regarding Petitioner's criminal history, to wit, that Petitioner had been convicted on a

30

firearms charge, and that his more recent charge for a "driving offense" remained pending.  But importantly, such inaccuracies were unquestionably corrected on the record, and the Court agrees with Respondents that notwithstanding DHS's failure to affirmatively withdraw them, there is nothing in the record to suggest that the IJ relied upon the inaccurate statements in denying bond. In fact, in her subsequent written bond memorandum, the IJ explicitly acknowledged that Petitioner has not been convicted of any violent crimes.  *See* Pet. Supp. Reply, Ex. C, IJ Bond Memo at 3.

The IJ did not apply the incorrect legal standard, or rely solely on evidence that could not— as a matter of law—have supported a denial of bond.  Accordingly, Petitioner has not demonstrated that the IJ violated Petitioner's due process rights.[20]  The SAP is **DENIED** in this regard.

**Conclusion**

For all of the foregoing reasons, the Second Amended Petition for a Writ of Habeas Corpus is **DENIED**.  The Clerk of Court is directed to close this case.

On December 19, 2025, pursuant to its authority under the All Writs Act, 28 U.S.C. § 1651, the Court restrained ICE from transferring Petitioner to any ICE detention facility beyond 150 miles of the Connecticut border during the pendency of the instant habeas petition.  *See* ECF No. 6.  At oral argument, Petitioner requested that, in the event the Court denied the instant habeas petition on the merits, the Court nevertheless leave the foregoing restraint in place pending Petitioner's appeal of the Court's decision.  The Court finds it appropriate to do so, pursuant to Rule 8 of the Federal Rules of Appellate Procedure.  *See, e.g.*, *N. Mariana Islands v. Millard*, 287 F.R.D. 204, 215 (S.D.N.Y. 2012).  Respondents shall not transfer Petitioner to any detention

---

[20]  Given that Petitioner has failed to demonstrate any due process violation arising from his bond hearing, the Court need not evaluate Respondents' threshold argument that Petitioner failed to exhaust his administrative remedies before seeking habeas review by this Court.

facility that is not within 150 miles of the Connecticut border, pending the filing and disposition of any appeal of the Court's decision herein.

     **SO ORDERED** at Bridgeport, Connecticut, this 17th day of June 2026.


                */s/ Kari A. Dooley*
                KARI A. DOOLEY
                UNITED STATES DISTRICT JUDGE